UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

ACE AMERICAN INSURANCE COMPANY,　　　:

　　　　Plaintiff,　　　　　　　　　　:　　16 Civ. 8773 (JSR)

　　　　　　　　　　　　　　　　　　　:　　OPINION AND ORDER

　　　　-v-　　　　　　　　　　　　　　:

AMERICAN GUARANTEE & LIABILITY
INSURANCE COMPANY,

　　　　Defendant.

------------------------------------

JED S. RAKOFF, U.S.D.J.

　　　　In this action, plaintiff ACE American Insurance Company
("ACE") and defendant American Guarantee & Liability Insurance
Company ("American Guarantee") dispute whether and to what
extent ACE or American Guarantee is ultimately responsible for
funding a $5 million share of a $24 million settlement of a
state-court personal injury lawsuit. To conclude the settlement
and resolve that lawsuit, ACE paid $3.5 million and American
Guarantee paid $1.5 million, with each reserving its right to
contest its obligations in a subsequent lawsuit, i.e., the
instant action. Currently before the Court are the parties'
cross-motions for summary judgment, each of which seeks a
declaration that the other insurer was responsible for the
entire amount. Upon careful consideration, the Court hereby
grants ACE's cross-motion, denies American Guarantee's cross-
motion, and declares that American Guarantee is responsible for

1

funding the settlement up to the limit of its $5 million excess policy.

By way of background, on November 11, 2016, ACE commenced this declaratory judgment action. See Complaint, ECF No. 1. Although the complaint recites two causes of action, ACE effectively seeks only one remedy: a declaration that American Guarantee, rather than ACE, was and remains responsible for funding the $5 million portion of the state-court settlement. See id. ¶¶ 38-47. On December 6, 2016, American Guarantee answered the complaint and brought two counterclaims against ACE, the first of which seeks a declaration that ACE is responsible for refunding to American Guarantee the $1.5 million that American Guarantee paid, and the second of which seeks $1.5 million in damages. See Answer with Affirmative Defenses and Counterclaims, ECF No. 13, ¶¶ 20-33. On March 28, 2017, American Guarantee filed an amended answer asserting for the first time the affirmative defense of unclean hands. See First Amended Answer with Affirmative Defenses and Counterclaims ("Am. Ans."), ECF No. 22, at 8. On May 19, 2017, ACE and American Guarantee cross-moved for summary judgment.[1] On June 8, 2017, ACE and

---

[1] See Plaintiff ACE American Insurance Company's Brief in Support of its Motion for Summary Judgment ("Plf. Mem."), ECF No. 31; Local Civil Rule 56.1(a) Statement of Material Facts in Support of Plaintiff ACE American Insurance Company's Motion for Summary Judgment ("Plf. 56.1 Stmt."), ECF No 32; American Guarantee & Liability Insurance Company's Memorandum of Law in Support of

2

American Guarantee each filed answering papers;[2] on June 20, 2017, ACE and American Guarantee each filed reply papers;[3] and on June 26, 2017, the Court held oral argument. See Transcript dated June 26, 2017. Having now carefully considered all the above, the Court rules in favor of ACE, for the reasons that follow.

A court may grant summary judgment "only where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Darnell v. Pineiro, 849 F.3d 17, 22 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). The court must "construe the evidence in the light most favorable to the [non-moving party], drawing all reasonable inferences and resolving all ambiguities in [its] favor." Id.

---

its Motion for Summary Judgment ("Def. Mem."), ECF No. 33; American Guarantee & Liability Insurance Company's Statement of Material Facts ("Def. 56.1 Stmt."), ECF No. 28.

[2] See American Guarantee & Liability Insurance Company's Memorandum of Law in Opposition to ACE American Insurance Company's Motion for Summary Judgment ("Def. Opp."), ECF No. 35; American Guarantee & Liability Insurance Company's Response to Plaintiff's Rule 56.1 Statement ("Def. 56.1 Resp."), ECF No. 36; Plaintiff ACE American Insurance Company's Brief in Opposition to Defendant's Motion for Summary Judgment ("Plf. Opp."), ECF No. 37; Plaintiff ACE American Insurance Company's Response to Defendant's Rule 56.1(a) Statement of Material Facts ("Plf. 56.1 Resp."), ECF No. 38.

[3] See Plaintiff ACE American Insurance Company's Reply Brief in Further Support of its Motion for Summary Judgment, ECF No. 40; American Guarantee & Liability Insurance Company's Reply Memorandum of Law in Further Support of its Motion for Summary Judgment ("Def. Reply"), ECF No. 41.

3

The relevant facts, which are undisputed, are as follows. On October 31, 2009, Richard Wager, an employee of Wager Contracting Company, Inc. ("Wager Contracting"), was injured while performing demolition work for Pelham Union Free School District ("Pelham"). Plf. 56.1 Stmt. ¶ 37; Def. 56.1 Resp. ¶ 37. Thereafter, in 2011, Richard Wager and his wife Sana Wager sued Pelham (among others) in New York state court, asserting claims for violations of the New York Labor Law and common law negligence. Def. 56.1 Stmt. ¶ 16; Plf. 56.1 Resp. ¶ 16. Pelham, in turn, sued Wager Contracting for common law and contractual indemnification. Def. 56.1 Stmt. ¶ 20; Plf. 56.1 Resp. ¶ 20.

Several insurance policies covering Wager Contracting and/or Pelham potentially provided coverage with respect to Richard Wager's injury. To begin with, non-party NGM Insurance Company ("NGM") had issued a $1 million primary general liability policy insuring both Wager Contracting and Pelham (the "NGM Policy"). Plf. 56.1 Stmt. ¶¶ 3-5; Def. 56.1 Resp. ¶¶ 3-5; see NGM Policy, Ex. B to Declaration of Adam M. Smith in Support of American Guarantee & Liability Company's Motion for Summary Judgment ("Smith Decl."), ECF No. 27. However, the NGM Policy included workers' compensation and employers' liability exclusions that, in general, barred coverage to Wager Contracting for employees' bodily injuries unless Wager Contracting had assumed that liability by contract. Plf. 56.1

4

Stmt. ¶¶ 7-11; Def. 56.1 Resp. ¶¶ 7-11. In this case, however, Wager Contracting had assumed such liability by contract with Pelham. Plf. 56.1 Stmt. ¶ 12; Def. 56.1 Resp. ¶ 12.

Second, American Guarantee had issued a $5 million Commercial Umbrella Liability Policy covering both Wager Contracting and Pelham (the "American Guarantee Policy"). Def. 56.1 Stmt. ¶ 11; Plf. 56.1 Resp. ¶ 11; see American Guarantee Policy, Ex B. to Rule 26(a) Initial Disclosure, ECF No. 17. The American Guarantee Policy was excess to the NGM Policy, to which the American Guarantee Policy "followed form." See Plf. 56.1 Stmt. ¶¶ 14-18; Def. 56.1 Resp. ¶¶ 14-18; see also Def. 56.1 Stmt. ¶¶ 12-13; Plf. 56.1 Resp. ¶¶ 12-13. In other words, the American Guarantee Policy adopted in general the NGM Policy's underlying substantive terms and thus provided the same basic coverage at the excess layer.

Third, New York Schools Insurance Reciprocal ("NYSIR") provided insurance to Pelham with limits of $1 million primary and $15 million excess (the "NYSIR Policy"). Plf. 56.1 Stmt. ¶ 35; Def. 56.1 Resp. ¶ 35; see NYSIR Policy, Ex. E to Smith Decl. The NYSIR Policy did not cover Wager Contracting. Plf. 56.1 Stmt. ¶ 36; Def. 56.1 Resp. ¶ 36.

Finally, ACE issued a Specific Excess Workers' Compensation and Employers' Liability Insurance Policy covering Wager Contracting (the "ACE Policy"). Plf. 56.1 Stmt. ¶¶ 21-28; Def.

56.1 Resp. ¶¶ 21-28; see ACE Policy, Ex. A to Rule 26(a) Initial Disclosure. As a formal matter, ACE issued this policy to the Special Trades Contracting and Construction Trust ("Special Trades"), a group self-insurance program authorized by the New York Workers' Compensation Law. Plf. 56.1 Stmt. ¶¶ 21, 24; Def. 56.1 Resp. ¶¶ 21, 24. Wager Contracting was a participant in Special Trades, and hence was covered under the ACE Policy. Plf. 56.1 Stmt. ¶¶ 23, 28; Def. 56.1 Resp. ¶¶ 23, 28. The ACE Policy was excess to Special Trades' $1 million workers' compensation/employers' liability self-insured retention ("SIR"). Plf. 56.1 Stmt. ¶¶ 27, 30; Def. 56.1 Resp. ¶¶ 27, 30. Theoretically, the ACE Policy provided unlimited workers' compensation and employers' liability coverage. Plf. 56.1 Stmt. ¶ 32; Def. 56.1 Resp. ¶ 32; see also Def. 56.1 Stmt. ¶ 3; Plf. 56.1 Resp. ¶ 3. However, the ACE Policy purported to limit its coverage to "damages imposed upon [Wager Contracting] by law," as opposed to liabilities assumed by contract. See ACE Policy, Part Two – Employers Liability Insurance ¶ B(1).

The net of all this was that Pelham was covered by the NYSIR Policy ($1 million primary/$15 million excess), by the NGM Policy ($1 million primary), and by the American Guarantee Policy ($5 million excess to the NGM Policy). Wager Contracting was covered, as to workers' compensation/employers' liability claims, by the $1 million SIR and by the ACE Policy (unlimited

excess to the SIR), and, for general liability, by the NGM
Policy ($1 million primary) and by the American Guarantee Policy
($5 million excess to the NGM Policy). To complicate matters
further, these policies covered bodily injuries under different
(and sometimes mutually exclusive) theories of liability. For
example, the American Guarantee policy excluded from coverage
liability for bodily injury based on a theory of common-law
indemnity, whereas the ACE Policy by implication excluded from
coverage liability for bodily injury based on a theory of
contractual indemnity.

On January 11, 2016, the state court hearing the underlying
personal injury action held, on summary judgment, that Pelham
was liable to Richard Wager under New York Labor Law Section
240. Plf. 56.1 Stmt. ¶ 51; Def. 56.1 Resp. ¶ 51; see Wager v.
Pelham Union Free School District, No. 68572/2012 (N.Y. Sup. Ct.
Jan. 11, 2016) ("Decision and Order"), Ex. V to Smith Decl. The
Decision and Order also somewhat cryptically resolved Wager
Contracting's summary judgment motion seeking dismissal of
Pelham's indemnity claims by dismissing so much of Pelham's
claims "as seek[] indemnification for sums up to the limits of
the policy insuring both Wager Contracting and [Pelham]." Plf.
56.1 Stmt. ¶ 52; Def. 56.1 Resp. ¶ 52; see Decision and Order,
Ex. V to Smith Decl., at 26.

Following the summary judgment decision, the parties reached an agreement to dismiss all claims, counterclaims, and cross-claims in the state-court lawsuit in exchange for paying $24 million to Richard Wager and Sana Wager. Plf. 56.1 Stmt. ¶ 55; Def. 56.1 Resp. ¶ 55. ACE sought to have American Guarantee fund its full $5 million policy, but American Guarantee resisted on the ground that, because the ACE Policy was unlimited, the American Guarantee Policy was never triggered. See Plf. 56.1 Stmt. ¶¶ 57-58; Def. 56.1 Resp. ¶¶ 57-58. In order to conclude the settlement, therefore, ACE and American Guarantee entered an Interim Funding Agreement under which ACE paid $3.5 million and AGLIC paid $1.5 million of the disputed $5 million, with each side reserving its right to resolve this dispute in a later proceeding. Plf. 56.1 Stmt. ¶ 59; Def. 56.1 Resp. ¶ 59; see Interim Funding Agreement, Ex. 43 to Declaration of Amy C. Gross in Opposition to Defendant's Motion for Summary Judgment, ECF No. 39. ACE also paid most of the balance of the $24 million settlement. Plf. 56.1 Stmt. ¶ 66; Def. 56.1 Resp. ¶ 66.

Against this background, the dispositive issue in this case is whether the New York antisubrogation rule[4] prevents American

---

[4] ACE and American Guarantee agree that New York law governs all issues raised by their cross motions. See Plf. Mem. at 14, 19; Def Mem. at 11.

Guarantee from bringing an indemnity claim as the subrogee of one of American Guarantee's insureds, Pelham, against another of American Guarantee's insureds, Wager Contracting. If such a claim is permitted under New York state law, then American Guarantee may shift its liability for Richard Wager's injury – which American Guarantee incurred through insuring Pelham - to Wager Contracting and, potentially, to ACE, the real party in interest. If such a claim is barred under New York state law, however, then American Guarantee is stuck with the $5 million liability.

Under New York law, the equitable doctrine of subrogation "entitles an insurer to 'stand in the shoes' of its insured to seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse." N. Star Reins. Corp. v. Cont'l Ins. Co., 82 N.Y.2d 281, 294 (1993) (citing Penn. Gen. Ins. Co. v. Austin Powder Co., 68 N.Y.2d 465, 471 (1986)). "An insurer, however, has no right of subrogation against its own insured for a claim arising from the very risk for which the insured was covered." Id. The antisubrogation rule is a common-law doctrine crafted by the New York Court of Appeals "both to prevent the insurer from passing the incidence of loss to its own insured and to guard against the potential for conflict of interest that may affect the insurer's incentive to provide a vigorous defense for its insured." Id. at 294-95.

9

The New York Court of Appeals has applied the
antisubrogation rule to block indemnity claims brought by excess
insurers such as American Guarantee. See Jefferson Ins. Co. of
N.Y. v. Travelers Indem. Co., 92 N.Y.2d 363, 373-75 (1998). In
Jefferson, an employee of Continental Copy caused an injury
while driving a van that was leased from A-Drive. Three carriers
insured both of these entities. A-Drive had a primary policy
issued by Reliance and an excess policy issued by Jefferson,
each of which also covered Continental Copy, whose employee was
a permissive user of the van. For its part, Continental Copy had
a comprehensive policy issued by Travelers that named A-Drive as
an additional insured. As relevant here, the New York Court of
Appeals had no trouble rejecting the excess insurer's attempt to
bring indemnity claims on behalf of A-Drive against Continental.
Id. at 373 ("[W]e conclude that the antisubrogation rule did bar
the indemnity claim against Travelers as the insurer of
Continental Copy.").

The Second Circuit, in a non-precedential decision, has
applied the antisubrogation rule in a case similar to the
instant case. See Ohio Cas. Ins. Co. v. Transcontinental Ins.
Co., 372 F. App'x 107 (2d Cir. 2010) (summary order) (applying
New York law). In this decision, an injured worker sued a
project owner, Downtown Development, LLC ("Downtown"), which
brought an indemnity claim against the injured worker's

10

employer, Wildman & Bernhardt Construction, Inc. ("Wildman").
Transcontintenal Insurance Company ("Transcontinental") had
issued two insurance policies, one a general liability policy
that covered both Downtown and Wildman, and the other a workers'
compensation/employers' liability policy covering only Wildman.
Ohio Casualty Insurance Company ("Ohio Casualty") had issued an
umbrella insurance policy covering both Downtown and Wildman
for, inter alia, liabilities assumed by contract; this policy
was excess to both of Transcontinental's policies. After Ohio
Casualty and Transcontintenal jointly funded a settlement
resolving all claims in exchange for an $8.8 million payment to
the injured worker, Ohio Casualty sought indemnity from
Transcontintenal as the unlimited insurer of Wildman. The Second
Circuit, however, rejected Ohio Casualty's attempt to assert a
subrogation claim on behalf of Downtown against Wildman, because
Ohio Casualty itself insured Wildman for one of the claims at
issue: the contractual, as opposed to common law, indemnity
claim. See id. at 112 ("[T]he antisubrogation rule prohibits
Ohio Casualty from pursuing the present litigation as though the
contractual claims between its two insureds did not exist.")
(citing Maksymowicz v. N.Y.C. Bd. of Educ., 647 N.Y.S.2d 780
(1st Dep't 1996)).

The same reasoning applies here. As in Ohio Casualty, an
excess carrier (American Guarantee) that insures both the

11

project manager (Pelham) and the injured worker's employer (Wager Contracting) seeks to shift its share of the settlement to the employer's primary insurer (ACE), which has an unlimited obligation for the injury at issue. As in Ohio Casualty, the only way the excess insurer can shift its liability to the primary insurer is via a subrogation claim on behalf of the project manager against the employer, i.e., on behalf of one insured against another insured. And as in Ohio Casualty, the excess carrier insures the employer for at least one of the claims resolved by the settlement of the injury lawsuit: the contractual indemnity claim. See Plf. 56.1 Stmt. ¶¶ 8-12, 14-18; Def. 56.1 Resp. ¶¶ 8-12, 14-18; see also Def. 56.1 Stmt. ¶¶ 12-13; Plf. 56.1 Resp. ¶¶ 12-13. Thus, as in Ohio Casualty, the antisubrogation rule bars American Guarantee's claim: American Guarantee cannot bring a subrogation claim on behalf of one insured, Pelham, against another insured, Wager Contracting, for a risk that American Guarantee covers.

American Guarantee argues that the antisubrogation rule does not apply for several reasons discussed below. But it is worth first observing that the core defect in American Guarantee's position is its singular focus on the coverage provided to Wager Contracting without considering how the liability could come to rest with that entity. In particular, American Guarantee frames this case as a coverage priority

dispute that only concerns how Wager Contracting's insurers must allocate coverage among themselves. American Guarantee argues that its policy is excess to ACE's policy, and that, because the ACE Policy is unlimited for the injury at issue, American Guarantee's excess layer is simply never reached.

This focus on Wager Contracting alone is mistaken. The state court decision found Pelham liable for Richard Wager's injury, and, because Pelham's primary coverage was indisputably insufficient to cover that liability, Pelham's excess policies (the NYSIR Policy and the American Guarantee Policy alike) were necessarily placed in issue. And, as American Guarantee concedes, see Def. Opp. at 11-12, the only way Pelham's liability can be transferred to Wager Contracting is through an indemnity claim. It is thus a mistake to focus solely on coverage priority as to Wager Contracting, because American Guarantee can only reach that entity (and its other insurance coverage) through an indemnity claim on behalf of one insured, Pelham, against another insured, Wager Contracting — which is the exact route blocked by the antisubrogation rule.[5]

---

[5] For these reasons, most of the cases the defendant cites in support of its argument against applying the antisubrogation rule are inapposite. See Tully Constr. Co., Inc. v Illinois Natl. Ins. Co., 15 N.Y.S.3d 404 (2nd Dep't 2015); Merchants Mut. Ins. Co. v. N.Y. State Ins. Fund, 926 N.Y.S.2d 783 (4th Dep't 2011); Comm'rs of State Ins. Fund v Aetna Cas. & Sur. Co., 728 N.Y.S.2d 6 (1st Dep't 2001). These cases concern a dispute over coverage priority as to a single policyholder with primary and

13

In arguing to the contrary, American Guarantee places great weight on a First Department decision that supposedly shows that Ohio Casualty was wrongly decided. See Liberty Mut. Ins. Co. v. Ins. Co. of State of Penn., 841 N.Y.S.2d 288 (1st Dep't 2007). So far as is clear from the face of decision, in Liberty Mutual, an injured worker sued the project owner, which brought indemnification claims against the worker's employer, General Industrial Service Corporation ("General").[6] One of General's two primary insurers and its sole excess insurer, Liberty Mutual Insurance Company ("Liberty Mutual"), settled the case for a total of $2.5 million. Afterward, Liberty Mutual sought reimbursement from the other primary insurer (AIG), whose bid to avoid repaying Mutual Liberty under the antisubrogation rule was seemingly rejected. See id. at 289 ("As to Liberty's claim for reimbursement of its indemnification of General, the fact remains that AIG was a primary insurer whose obligation to cover General's liability took precedence over that of Liberty, an

_____

excess policies issued by separate insurers. Each stands only for the proposition that an excess policy cannot be triggered until the primary policy is exhausted. None implicates or even discusses the antisubrogation rule.

[6] To be precise, the injured employee sued both the project owner and the construction manager, each of which filed indemnification claims against the employer. See Liberty Mutual, 841 N.Y.S.2d at 289. In other words, two parties filled the role that Pelham alone fills in this case. However, because that distinction makes no difference, the Court treats them collectively.

excess insurer, and AIG may not avoid its contractual obligation to the insured by invoking the antisubrogation rule."). American Guarantee urges that this is the precise fact pattern at issue in the instant case and that this decision compels rejecting ACE's invocation of the antisubrogation rule.

American Guarantee's reliance on Liberty Mutual is misplaced. Even if Liberty Mutual were binding on this Court (and it is not), there is considerable doubt that the decision does, in fact, support American Guarantee's position. Moreover, to the extent that it does, it does so in derogation of the New York Court of Appeals' articulation of the antisubrogation rule, which is binding on this Court.

In particular, there are at least three plausible readings of the Liberty Mutual decision's apparent rejection of the antisubrogation rule:

First, under the reading of the decision urged by ACE, Liberty Mutual did not involve a carrier attempting to bring a subrogation claim on behalf of one insured against another insured at all, but was instead merely a coverage priority dispute concerning a single party — the employer, General. And in fact, the decision does not indicate one way or another whether Liberty Mutual also insured the project owner, as would be needed to implicate the antisubrogation rule. Although the appellate briefs underlying the decision reveal that one party

15

argued that Liberty Mutual also covered the project owner, see Ex. AA to Smith Decl., Liberty Mutual's enigmatic rejection of the antisubrogation rule may merely mean that the First Department found otherwise. Under this reading, Liberty Mutual stands only for the unremarkable proposition that excess coverage is not triggered until the primary coverage is exhausted. That offers no aid to American Guarantee.

Second, the Liberty Mutual court may have concluded that Liberty Mutual insured both the project owner and the employer (as needed to implicate the antisubrogation rule), but may nonetheless have held in Liberty Mutual's favor because AIG likewise insured the project owner and employer. This reading is suggested by Liberty Mutual's citation to Jefferson Insurance Company, 92 N.Y.2d at 375, which involves that precise fact pattern. As explained above, Jefferson expressly held that the antisubrogation rule bars the common insurer's indemnity claim in this scenario, but, given the unusual cross-coverage, Jefferson nonetheless allowed the excess insurer to recover from the primary insurer because the excess insurer's obligations were never triggered as to either insured. Under this reading of Liberty Mutual, while the antisubrogation rule barred Liberty Mutual's subrogation claim, Liberty Mutual was nonetheless entitled to reimbursement because AIG was obligated to provide primary coverage to both insureds before Liberty Mutual's excess

layer was triggered. This reading of Liberty Mutual would offer American Guarantee no support because ACE only insured Wager Contracting, the employer, and not Pelham, the project owner.

Third, and finally, under the reading urged by American Guarantee, the First Department may have found that, much like the instant case, Liberty Mutual, the excess carrier, insured the project owner and the employer, and AIG, the primary carrier, insured only the employer, but may nonetheless have concluded that the antisubrogation rule did not apply because the employer's primary coverage must be exhausted first. While that reading would indeed support American Guarantee's position here, it cannot be reconciled with the New York Court of Appeals' authoritative interpretation of the antisubrogation rule that this Court is bound to follow. As explained above, in Jefferson, the New York Court of Appeals squarely held that an excess insurer cannot bring a subrogation claim against another insured for a risk it covers. See 92 N.Y.2d at 373 ("Reaching [excess insurer] and [first primary insurer's] alternative theory of recovery — indemnity — we conclude that the antisubrogation rule did bar the indemnity claim against [second primary insurer] as the insurer of Continental Copy."). The fact that the ACE Policy is unlimited in this case but not in Jefferson makes no difference; the antisubrogation rule blocks this path regardless of what lies at its end. Thus, even if,

*arguendo*, *Liberty Mutual* rejected the antisubrogation rule on the same facts that are present here, the decision cannot be followed. Accordingly, *Liberty Mutual* provides no basis whatsoever to refuse to apply the antisubrogation rule to the instant case.

American Guarantee next attempts to avoid the antisubrogation rule by arguing that the rule does not apply when the policy justifications underlying the rule are absent, as they supposedly are here. As noted, the New York Court of Appeals created the antisubrogation rule "both to prevent the insurer from passing the incidence of loss to its own insured and to guard against the potential for conflict of interest that may affect the insurer's incentive to provide a vigorous defense for its insured." *N. Star Reins.*, 82 N.Y.2d at 294-95. Here, American Guarantee argues that it was not seeking to pass its loss to its own insured because ACE's policy provided unlimited coverage for Richard Wager's injury, and that there was no conflict of interest because American Guarantee did not control the defense of Wager Contracting or Pelham.

This argument is not persuasive. For one thing, American Guarantee is, in fact, trying to shift its liability to a policyholder that it insured for that very risk. In other words, American Guarantee, which insures Wager Contracting for bodily injuries to its employees as they arise out of contractual

assumptions of liability, is trying to shift the liability for Richard Wager's injury to Wager Contracting. American Guarantee's argument that this somehow does not implicate the antisubrogation rule erroneously relies on the fact that Wager Contracting was separately covered for this risk by the ACE Policy. As Ohio Casualty makes clear, however, the relevant question is whether the common insurer's policies respond to the underlying liability, not whether some other insurer's policy happens also to respond to that risk. See 372 F. App'x at 111-12. Accordingly, because American Guarantee insures Wager Contracting for Richard Wager's injury, American Guarantee's attempt to avoid funding the settlement runs afoul of the main reason for the antisubrogation rule.

Thus, American Guarantee's argument is reduced to the contention that where the second policy underlying the antisubrogation rule – avoiding an insurer's conflict of interest with its insureds – is absent, the rule does not apply. That is not the law. Indeed, the New York Court of Appeals has applied the antisubrogation doctrine to excess and primary insurers alike without noting whether either insurer controlled the underlying litigation or was otherwise at risk of having a conflict of interest with a policyholder. See Jefferson, 92 N.Y.2d at 373-75. Accordingly, although it is undisputed that American Guarantee did not control the state-court litigation,

that fact does not permit American Guarantee to avoid the antisubrogation rule.

None of American Guarantee's cases is to the contrary. For the most part, each declines to apply the antisubrogation rule because its elements were not satisfied, not because the animating policies were not present. See, e.g., Pesta v. City of Johnstown, 862 N.Y.S.2d 162, 165 (3rd Dep't 2008) (declining to apply the rule where the policies either named only one insured or excluded from coverage the risk at issue); McGurran v. DiCanio Planned Dev. Corp., 628 N.Y.S.2d 773, 774 (2nd Dep't 1995) ("[The] policy does not insure both DPD and DRC for the specific claims raised by the plaintiff in the underlying personal injury action[.]"). And American Guarantee's final case in this vein, Hartford Acc. & Indem. Co. v Mich. Mut. Ins. Co., 61 N.Y.2d 569 (1984), is inapposite on its face, for it held only that a conflicted insurer could not, under the guise of honoring the antisubrogation rule, dodge various bad-faith claims for failing to implead the injured worker's employer. Here, of course, Wager Contracting was duly impleaded; indeed, the thrust of American Guarantee's position is that its indemnity claim against Wager Contracting is permissible.[7]

---

[7] In a similar vein, American Guarantee protests the purported anomaly of finding that the antisubrogation rule blocks indemnity claims against Wager Contracting brought by Pelham's primary insurer (NGM) and top-layer excess insurer (American

For its next argument, American Guarantee contends that ACE is collaterally estopped from asserting that the antisubrogation rule bars American Guarantee's indemnity claim on behalf of Pelham against Wager Contracting. "Under New York law, the doctrine of issue preclusion only applies if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding."[8] Colon v. Coughlin, 58 F.3d 865, 869 (2d Cir. 1995) (footnote omitted) (citing Kaufman v. Eli Lilly & Co., 65 N.Y.2d 449 (1985)). The doctrine applies "only if it is quite clear that these requirements have been satisfied, lest a party be 'precluded from obtaining at least one full hearing on his or her claim.'" Id. (quoting Gramatan Home Investors Corp. v. Lopez, 46 N.Y.2d 481, 485 (1979)). American Guarantee argues

_____

Guarantee), but does not block an indemnity claim against Wager Contracting brought by the supposedly intermediate excess insurer (NYSIR). See Transcript dated June 26, 2017. But that is no anomaly at all, because NGM and American Guarantee each insured both Pelham and Wager Contracting, whereas NYSIR insured Pelham alone. The antisubrogation rule thus stood as no bar to NYSIR's (successful) bid to shift its liability to Wager Contracting, and it is for this reason that ACE, as the unlimited insurer of Wager Contracting, paid the vast majority of the $24 million settlement.

[8] This issue is governed by New York state law because the underlying decision was issued by a state court. See Colon, 58 F.3d at 869 n.2 ("We give a prior state court decision the same preclusive effect that the courts of that state would give to it.").

ACE is bound by the state-court's alleged rejection of the argument that the antisubrogation rule bars American Guarantee's claim.

It is true that the state court, in its decision on summary judgment, briefly touched on the antisubrogation rule. In full, the relevant passage reads:

> Additionally, Wager Contracting is entitled to summary judgment dismissing so much of [Pelham's] third-party cause of action as seeks indemnification for sums up to the limits of the policy insuring both Wager Contracting and [Pelham]. Moreover, while [Pelham's] claims for indemnification beyond the limits of Wager Contracting's policy are not barred, an award of summary judgment on [Pelham's] third-party claims for indemnification would be premature at this time.

See Decision and Order, Ex. V to Smith Decl., at 26. American Guarantee's collateral estoppel argument is based on the state court's use of the singular ("policy") rather than the plural ("policies") in applying the antisubrogation rule. Thus, American Guarantee urges that "policy" refers exclusively to NGM's primary policy that insured both Pelham and Wager Contracting and excludes by implication American Guarantee's "follow-form" excess policy. On this reading, the state court found that the antisubrogation rule only barred NGM's indemnity claims, but not American Guarantee's. The defendant further argues that the state court, by stating that the indemnity claims "beyond the limits of Wager Contracting's policy are not barred," affirmatively found that the antisubrogation rule does

22

not apply to American Guarantee's indemnity claim. On this reading, if the state court meant to apply the antisubrogation rule to American Guarantee, it supposedly would have used the word "policies" in explaining the scope of its holding.

The Court disagrees with the defendant's reading of the summary judgment decision. ACE is not collaterally estopped from asserting the antisubrogation rule against American Guarantee because it is far from "quite clear" that the state court "actually and necessarily" held in American Guarantee's favor on this issue. See Colon, 58 F.3d at 869. Most obviously, the state court decision does not expressly reject the antisubrogation rule as to any insurer; in fact, the decision's only clear holding is that the antisubrogation rule does indeed block an indemnity claim on behalf of Pelham against Wager Contracting — at least to the limit of some unidentified "policy." The state court decision also fails to identify what the relevant insurance policies were, as would be expected for a decision applying the antisubrogation rule as to one policy but rejecting it as to another. Moreover, because a decision applying the antisubrogation rule differently to a primary insurer and a "follow form" excess insurer covering the same risk would be, for the reasons discussed supra, at the very least in serious

tension with binding New York precedents, one would expect the state court to explain its reasoning — which it plainly did not.[9]

The better reading of the summary judgment decision is that the state court found (as does this Court) that the antisubrogation rule barred the common insurers' indemnity claims, but, because damages were not yet fixed, did not reach whether that holding applied to both NGM and American Guarantee. Indeed, the state court understood Pelham to argue that the antisubrogation rule issue was not ripe for that very reason. See Decision and Order, Ex. V to Smith Decl., at 17. The state court therefore used the word "policy" in the abstract to mean "insurance coverage," and not to implicitly distinguish between primary and excess policies. This reading is bolstered by the fact that the state court, after finding that the antisubrogation rule applied in the abstract, expressly reserved decision on whether to award summary judgment to Pelham on claims beyond the limits of the "policy," finding any such determination would be "premature." That same uncertainty in

---

[9] American Guarantee's insistence that the state court's use of the singular is conclusive is particularly dubious in the context of this passage, where the state court referred to the "limits" of the "policy" without explaining how a supposedly single policy had multiple limits. The state court also referred indifferently to Pelham's indemnification claims against Wager Contracting in the singular ("third-party cause of action as seeks indemnification") and the plural ("third-party claims for indemnification").

damages rendered premature a decision distinguishing between Pelham's different carriers.

Accordingly, ACE is not collaterally estopped from asserting the antisubrogation rule here.

For the defendant's final argument against the application of the antisubrogation rule, American Guarantee argues that ACE is barred from asserting the antisubrogation rule because ACE acted inequitably in the state-court litigation. See HDI-Gerling Am. Ins. Co. v. Navigators Ins. Co., 199 F. Supp. 3d 422, 430 (D. Mass. 2016) (applying New York law) (denying summary judgment where there was a genuine factual dispute that the primary insurer "deliberately allocated the settlement in such a manner as to force [the excess insurer] to cover the excess amount at issue"). Here, American Guarantee argues that ACE, which controlled the defense of Wager Contracting in the state-court lawsuit, authorized a legal strategy focused on minimizing ACE's losses and shifting liability to American Guarantee rather than on defending Wager Contracting against all claims.

This is, in effect, an invocation of the equitable "unclean hands" doctrine.[10] Under New York law, American Guarantee, as the proponent of the unclean hands defense, must demonstrate that

---

[10] Although American Guarantee avoids labeling this argument as such, unclean hands is the defense American Guarantee set up in its answer. See Am. Ans. at 8.

"(1) [ACE] is guilty of immoral, unconscionable conduct; (2) the conduct was relied upon by [American Guarantee]; and (3) [American Guarantee] was injured thereby." See Versatile Housewares & Gardening Sys., Inc. v. SAS Grp., Inc., No. 09-cv-10182 (SHS), 2016 WL 4064036, at *5 (S.D.N.Y. July 29, 2016); see also Nat'l Distillers & Chem. Corp. v. Seyopp Corp., 17 N.Y.2d 12, 15-16 (1966) ("[The unclean hands doctrine] is never used unless the plaintiff is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct." (internal quotation marks omitted)).

American Guarantee has failed to establish (or even raise a genuine dispute of material fact) that the unclean hands doctrine bars ACE from asserting the antisubrogation rule. The undisputed evidence shows that the counsel retained by ACE to defend Wager Contracting conscientiously acted in Wager Contracting's best interest in the underlying litigation. At bottom, then, American Guarantee's argument is that it was inequitable not to prioritize American Guarantee's interests in the case. But the mere fact that Wager Contracting's interests did not align with American Guarantee's does not even begin to suggest the type of bad-faith misconduct needed to make out a defense of unclean hands.

In particular, American Guarantee marshals the following evidence in support of its argument that ACE's immorally or unconscionably managed the state-court litigation to American Guarantee's detriment. In 2012, the law firm initially assigned to defend Wager Contracting (Stewart, Greenblatt, Manning & Baez) was uncertain whether the antisubrogation rule would bar American Guarantee's claim on behalf of Pelham against Wager Contracting. See Def. 56.1 Stmt. ¶ 30; Plf. 56.1 Resp. ¶ 30.[11] ACE thereafter retained new counsel to defend Wager Contracting (Fabiani Cohen & Hall, LLP), which evaluated the extent of Wager Contracting's insurance coverage and concluded that, by virtue of the antisubrogation rule, American Guarantee's $5 million policy was potentially available as a "cushion" to partially shield ACE from any judgment or settlement arising out of

---

[11] In particular, Wager Contracting's initial counsel reported as follows:

> With respect to the $5 million excess policy issued by American Guarantee & Liability Insurance Co., we still do not have a complete copy of the policy. We will need to review the policy to confirm whether the anti-subrogation rule bars [Pelham's] claims against Wager Contracting Co., up to the extent of the excess policy as well.
> . . .
> Wager Contracting Co.'s Employer Liability carriers will likely be on the hook for the entire settlement or verdict in excess of the amount barred by the anti-subrogation rule in light of the fact that the plaintiff has suffered a grave injury.

Ex. J to Smith Decl. at 1-2.

Richard Wager's injury. For example, on March 22, 2015, Stephen Cohen wrote to ACE:

> If Pelham, et al are in fact covered under Wager's GL primary and excess policy as AI's, the rule of anti-subrogation would bar the third party claim against Wager Contracting to the extent of the insurance limits made available. In that sense, Wager's GL insurance would in effect, be primary vis a vis the ACE EL coverage. If Pelham, et al. are not covered under Wager's GL primary and excess policies as AI's but those policies do afford coverage to Wager for contractual indemnity, those policies should co-insure with ACE until they are exhausted. In either case, you have a cushion or a partner equal to Wager's GL primary and excess limits.

See Ex. L to Smith Decl., at 2. The Fabiani Cohen & Hall law firm also considered, but ultimately rejected, making an argument on summary judgment in the state-court litigation that might potentially have defeated Pelham's contractual indemnity claim against Wager Contracting (a theory of liability plainly covered by the American Guarantee Policy, but likely not covered by the ACE Policy). See id. at 4 ("Some preliminary thoughts (and these are still a work in progress) . . . [W]e will argue that Pelham hasn't proven that that indemnity provision at issue . . . was part of the Wager Contracting contract.").

American Guarantee argues that the foregoing conduct was inequitable because it shows that ACE manipulated the state-court litigation to protect ACE, not to protect Wager Contracting. American Guarantee points out that, because the ACE Policy was unlimited for the injury at issue, it would make no

difference to Wager Contracting whether the antisubrogation rule applied to American Guarantee; Wager Contracting's only concern would be that it is covered. Thus, any efforts even to investigate other possible sources of coverage were not in Wager Contracting's interest.

However, American Guarantee has failed to show "immoral, unconscionable conduct" on the part of ACE. See Versatile Housewares, 2016 WL 4064036, at *5. To start with, American Guarantee has failed to show that ACE manipulated the litigation to the detriment of its insured, Wager Contracting, which might arguably meet that demanding standard. American Guarantee's sole evidence of such manipulation is the fact that Wager Contracting's lawyers decided against raising, on summary judgment, the argument that the relevant contract lacked an indemnity clause altogether, which might theoretically have defeated Pelham's contractual indemnity claim. However, that argument, when tentatively raised by Wager Contracting's lawyers, was expressly couched as a work in progress. See Ex. L to Smith Decl. More importantly, ACE also argues, and American Guarantee does not deny, that the argument was presumably rejected because it was frivolous: the indemnity provision was plainly, and permissibly, incorporated by reference into the relevant contract. See Plf. Opp. at 13-14 & n.14; cf. Def. Reply

at 6. There is thus no showing that the litigation was conducted against Wager Contracting's interest.

All American Guarantee has shown, therefore, is that ACE arguably managed the underlying litigation with both Wager Contracting's and ACE's interests in mind: Wager Contracting because all viable arguments were made on its behalf, and ACE because one of those arguments, the antisubrogation rule, had the collateral effect of reducing ACE's exposure. But it was not unconscionable and immoral to proceed in this fashion. Indeed, attorneys potentially risk malpractice claims where they fail to maximize insurance coverage for their clients, see Shaya B. Pac., LLC v. Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, 827 N.Y.S.2d 231, 235-36 (2d Dep't 2006), and arranging the litigation to be able to draw on both the ACE Policy and the American Guarantee Policy (if need be) is consistent with that duty. If nothing else, raising the antisubrogation rule was a costless way for Wager Contracting to guard against the possibility, however remote, of ACE's insolvency or refusal to honor its policy.

Finally, when ACE settled the litigation, it did not attempt to allocate certain portions of the funds to particular theories of liability (e.g., the contractual indemnity claim) in a bid to trigger American Guarantee's payment obligations; instead, it merely settled for a lump sum ($24 million) and left

for judicial resolution in this case whether the antisubrogation rule would apply. Cf. HDI-Gerling Am. Ins. Co., 199 F. Supp. 3d at 429 (finding fact question concerning whether the primary insurer "deliberately allocated the settlement in such a manner as to force [the excess insurer] to cover the excess amount at issue"). American Guarantee has thus failed to show "immoral [and] unconscionable" conduct.[12]

American Guarantee has also failed to show reliance on the alleged misconduct. See Nat'l Distillers & Chem. Corp., 17 N.Y.2d at 15-16 ("[The unclean hands doctrine] is never used unless the plaintiff is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation . . . ." (internal quotation marks omitted)). American Guarantee points to no evidence that it somehow relied on the actions taken by counsel for Wager Contracting that ACE retained. Indeed, there

---

[12] American Guarantee also argues that ACE engaged in other miscellaneous misconduct, such as "pressuring" the defendant into settling, but these claims uniformly lack the requisite connection to the defendant's core complaint: that ACE unfairly manipulated the state-court litigation. See Nat'l Distillers & Chem. Corp., 17 N.Y.2d at 15. For example, AGLIC claims that the Fabiani Cohen & Hall firm falsely told the state court that NGM had agreed to defend Wager Contracting, when in fact NGM did not do so for another month. It is doubtful that American Guarantee has even raised a genuine factual dispute on this point, but assuming arguendo that it has, these alleged misrepresentations simply do not implicate American Guarantee's manipulation theory, nor has American Guarantee shown how it might possibly have been injured thereby.

is no dispute that American Guarantee's representative testified
that she had no complaints about how the Fabiani Cohen & Hall
firm handled the state-court litigation and never even discussed
the antisubrogation rule with that firm, even after the firm
mentioned it in writing several times. See Plf. 56.1 Resp.
¶¶ 66-67, 70, 72 (citing Deposition of Barbara Picinich).
Accordingly, American Guarantee has failed to show that ACE
cannot assert the antisubrogation rule under the unclean hands
defense.

The Court has considered American Guarantee's other
arguments and finds them totally without merit.[13] Thus, for the
foregoing reasons, the Courts finds that the antisubrogation
rule precludes American Guarantee from bringing any
indemnification claim on behalf of Pelham against Wager
Contracting to the extent of such entities' common coverage as
relates to liability for Richard Wager's injury. The Court
therefore, in addition to denying American Guarantee's cross-
motion for summary judgment, grants summary judgment in favor of
ACE declaring that American Guarantee was and remains
responsible for paying the full $5,000,000 limit of the American
Guarantee Policy in connection with the state-court settlement.

---

[13] In particular, the Court, having found that the
antisubrogation rule blocks American Guarantee's claim, need not
reach the parties' other main dispute, viz., whether the
American Guarantee Policy is excess to the ACE Policy.

It follows that American Guarantee must pay to ACE $3,500,000 as reimbursement for the share of the Interim Funding Agreement paid by ACE. Clerk to enter judgment.

SO ORDERED.

Dated:     New York, NY
           July 2, 2017                        JED S. RAKOFF, U.S.D.J.